## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SHANNAH M. KURLAND,<br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>CITY OF PROVIDENCE, by and through its Treasurer, James J. Lombardi, III, GEORGE SMITH alias, RALPH ABENANTE, alias, and KYLE RICHARDS, alias, individually and in their official capacities as police officers in the City of Providence Police Department, and HUGH T. CLEMENTS, JR., alias, individually and in his official capacity as Chief of the City of Providence Police Department, and STEVEN M. PARÉ, alias, individually and in his official capacity as Commissioner of Public Safety for the City of Providence,<br>　　　　　　　Defendants. | C.A. No. 18-cv-440-MSM-LDA |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

# I.    INTRODUCTION

On August 13, 2015, Shannah Kurland was attending a meeting of the Rhode Island Homeless Advocacy Project to discuss the right to stand in public spaces, such as sidewalks, particularly in the downtown Kennedy Plaza area.  Conflicts between the homeless population and business owners in the area were and remain commonplace.  Business owners complained of homeless individuals loitering near

their businesses, and homeless individuals complained of being ordered to move from public spaces near businesses by the Providence Police.[1]

Shortly after the meeting, Ms. Kurland's associate received a call from a homeless individual in the Kennedy Plaza area who claimed that police officers were ordering people to move from the sidewalk near the CVS on Fulton Street. Because Ms. Kurland was nearby, she decided to go to Kennedy Plaza to assess the situation. When she arrived, she encountered Providence Police officers Ralph Abenante and Kyle Richards.

Officers Abenante and Richards were assigned to the Bike Unit under the supervision of Lieutenant George Smith. The officers were on posts at Kennedy Plaza that afternoon. Their mission, as they understood it, was to address "quality of life problems in Kennedy Plaza." (ECF No. 55-1 at 18.) Specifically, the officers were instructed to "disperse subjects loitering in front of area businesses and committing other city ordinance violations or crimes." (ECF No. 55-3 at 9.) Prior to their encounter with Ms. Kurland, Officers Abenante, and Richards had been patrolling the Kennedy Plaza area and had ordered several individuals to leave spaces in front of businesses, including the CVS.

After a brief conversation with a woman who explained that two officers near the entrance to CVS, later determined to be Officers Abenante and Richards, had ordered her to move, Ms. Kurland decided to take up a position on the sidewalk to the right of the store's entrance. The precise position that Ms. Kurland took, which is

---

[1] The facts in the Introduction are drawn from the parties' Statements of Undisputed Facts, with disputes noted where they appear. (*See* ECF Nos. 55, 58 & 59.)

integral to this action, remains in dispute.  Ms. Kurland stood somewhere near the CVS entrance against the wall, lit a cigarette, and smiled at Officers Abenante and Richards standing nearby.  Less than a minute later, Officer Abenante told her that she was not allowed to stand there, that she was obstructing the entrance, and that she ought to move.  Ms. Kurland refused to comply, asserting that she was legally allowed to stand where she was standing.  At some point during the ensuing discussion, Ms. Kurland acquiesced and moved from her initial position to the curbside of the sidewalk.

The dialogue between Ms. Kurland and Officer Abenante attracted the attention of individuals nearby, and a crowd began to gather on the curbside of the sidewalk near the entrance to the CVS.  It remains disputed whether Ms. Kurland called for people to gather, or whether the spectacular nature of the encounter independently drew the crowd around her.  In any event, Ms. Kurland continued her conversation with Officer Abenante, Officer Richards, and the group.  Officer Abenante accused the group of obstruction, accused certain individuals of disorderly conduct, and asserted that he was empowered to order the group to move.  Ms. Kurland cited case and statutory law to the officers that she believed supported the group's right to remain in their position without interference, focusing on the case *State of Rhode Island v. McKenna,* 415 A.2d 729 (R.I. 1980) and § 16-13(c) of the Providence City Code of Ordinances.  During this exchange, Officer Abenante called his supervisor, Lieutenant Smith, to help resolve the situation.

Lieutenant Smith was already in the Kennedy Plaza area when he received the call from Officer Abenante.  Coincidentally, Lieutenant Smith was in the area to meet with a local business owner and the director of the Downtown Improvement District to discuss complaints about homeless individuals loitering near area businesses.  Because Lieutenant Smith was nearby, he arrived on the scene within minutes.

After briefly speaking with Officers Abenante and Richards, Lieutenant Smith decided that Ms. Kurland and the group were obstructing the CVS and asked Ms. Kurland to move.  Ms. Kurland refused, asserting that there was sufficient space on the sidewalk for customers to enter and exit the store.  Lieutenant Smith then entered the CVS to speak with the store's manager.  After obtaining a witness statement from the manager, Lieutenant Smith decided to proceed with an arrest of Ms. Kurland.  Lieutenant Smith informed Ms. Kurland that she would be arrested and that she would be charged with "failure to move."  (ECF No. 55 at 10.)Soon after, she was placed in handcuffs and transported to the Providence Public Safety Complex.

Ms. Kurland was ultimately charged with obstruction of a police officer under R.I.G.L. § 11-32-1, vandalism by obstruction of a business under R.I.G.L. § 11-44-1, disorderly conduct ("violent, tumultuous behavior") under R.I.G.L. § 11-45-1(a)(1), and disorderly conduct ("obstruction of a street or sidewalk") under R.I.G.L. § 11-45-1(a)(4).  Ms. Kurland was held in custody for three hours.  After her release, she remained under conditions of restricted liberty, unable to leave the state without permission from a Rhode Island Superior Court judge, from the date of her arrest

until the disposition of her case, without a conviction, more than nine months later. Ms. Kurland now sues Lieutenant Smith, Officer Abenante, Officer Richards, Providence Police Chief Hugh T. Clements, Providence Public Safety Commissioner Steven M. Paré, and the City of Providence alleging that that she was seized and prosecuted without probable cause and in violation of her constitutional rights.

## II.    JURISDICTION AND STANDARD OF REVIEW

This Court has federal-question jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Ms. Kurland seeks damages under 42 U.S.C. § 1983 alleging violations of her civil rights by state officials. "Almost by definition, a claim under § 1983 arises under federal law and will support federal-question jurisdiction [under § 1331.]" *Loc. Union No. 12004, United Steelworkers v. Massachusetts*, 377 F.3d 64, 75 (1st Cir. 2004). The Court exercises supplemental jurisdiction over Ms. Kurland's state-law claims pursuant to 28 U.S.C. § 1367, as the state and federal-law claims arise from "a common nucleus of operative fact." *Corrigan v. R.I. Dept. of Bus. Reg.*, 820 F. Supp. 647, 664–65 (D.R.I.1993) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

The parties have moved for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment's role in civil litigation is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug Inc.,* 895 F.2d 4. 50 (1st Cir. 1990). Summary judgment can be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there

is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir. 2000) (quoting *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir. 1996)). The court views the facts at summary judgment "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir. 2000) (citing *Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 672 (1st Cir. 1996)).

## III.   DISCUSSION

While there are intricacies to attend to, the core of this lawsuit can be distilled to a single dispute: whether there was probable cause to believe that Ms. Kurland was obstructing the sidewalk, the CVS, or police officers in the commission of their duties. The defendants allege that Ms. Kurland was blocking the entrance to a business and encouraging others to do the same. Ms. Kurland asserts that she was not impeding the free flow of pedestrian traffic and alleges that the defendants unreasonably seized her and unlawfully restricted her freedom of speech.

The case presents a conflict between an individual's right to stand on a public sidewalk and the government's interest in maintaining free passage through public spaces. Within this conflict lies an implicit question about the limits of government

authority to disperse persons occupying public space, particularly those public spaces where the presence of "so-called undesirable" individuals is believed to harm public safety or commerce. *See Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) (striking down an anti-loitering ordinance as unconstitutionally vague).

Under similar circumstances, the Supreme Court has recognized that the Constitution rejects any "regime in which the poor and the unpopular are permitted to 'stand on a public sidewalk … only at the whim of any police officer.'" *Papachristou*, 405 U.S. at 170 (quoting *Shuttlesworth v. Birmingham*, 382 U.S. 87, 90 (1965)). The liberty to "loaf[] or loiter[]" in public space is "historically part of the amenities of life as we have known them." *Id.* at 164. Together with the First Amendment, "[t]hese unwritten amenities have been in part responsible for giving our people the feeling of independence and self-confidence, the feeling of creativity…[and] have encouraged lives of high spirits rather than hushed, suffocating silence." *Id.* Any government scheme that intrudes upon this "freedom to loiter for innocent purposes" invites discrimination and abuse and should be regarded with constitutional suspicion. *See City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) (plurality opinion) (recognizing a fundamental right to "remain in a public place of [one's] choice").

That said, while the liberty to idly linger in public space without government intrusion has been recognized by the Court, a person who blocks the free passage of others on a street or sidewalk can be asked to move. *Shuttlesworth*, 382 U.S. at 92. And police can make arrests on probable cause that a crime has been committed in their presence, even if the criminal offense is minor. *Atwater v. City of Lago Vista*,

532 U.S. 318, 326 (2001); *see also Terry v. Ohio*, 392 U.S. 1, 14 (1968) (detentions that stop short of arrest require reasonable suspicion). The question becomes: was there cause to believe Ms. Kurland obstructed the CVS or otherwise committed a crime in the officers' presence? At this stage, that question cannot be answered. Because material facts about Ms. Kurland's arrest are genuinely disputed, summary judgment of Ms. Kurland's federal-constitutional claims is not appropriate for Ms. Kurland or most of the defendants.

### A.    Lieutenant Smith, Officer Abenante, and Officer Richards

#### 1. Unconstitutional Seizure and Common Law False Arrest

The Fourth Amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Because arrests are seizures of persons, they must be reasonable under the circumstances. *See D.C. v. Wesby*, 583 U.S. 48, 56 (2018). A warrantless arrest is reasonable if the officers have probable cause to believe that the suspect committed a crime in the officers' presence. *Atwater*, 532 U.S. at 354. Probable cause exists where "at the moment of the arrest, the facts and circumstances within the [officers'] knowledge and of which they had reasonably reliable information were adequate to warrant a prudent person in believing that the object of his suspicions had perpetrated or was poised to perpetrate an offense." *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 254 (1st Cir. 1996). Police conduct that stops short of arrest which nevertheless "by means of physical force or show of authority … in some way restrain[s] the liberty of a citizen" also effects a seizure

subject to Fourth Amendment scrutiny. *Terry*, 392 U.S. at 19 n. 16. A seizure stopping short of arrest must be supported by reasonable suspicion that "criminal activity may be afoot." *Id.* at 31.

### a. The Seizure of Ms. Kurland

Ms. Kurland claims that Officer Abenante, Officer Richards, and Lieutenant Smith unreasonably seized and falsely arrested her during the Kennedy Plaza encounter. Officers Abenante and Richards counter that even if Ms. Kurland's arrest were unreasonable, only Lieutenant Smith may be held liable when "neither of them arrested the plaintiff or directed that she be arrested." (ECF No. 56-1 at 5.) The officers contend that Ms. Kurland was always free to leave right up to the point that Lieutenant Smith formally informed her that she was under arrest, and they argue that it follows as a matter of law that they cannot be liable for unreasonable seizure or false arrest. *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544, 545 (1980) (a seizure occurs when "a reasonable person would have believed that he was not free to leave")).

Ms. Kurland does not genuinely dispute that she felt free to leave until Lieutenant Smith's arrival on the scene. But the crux of the conflict in this case is that Ms. Kurland *did not want to leave*. Ms. Kurland was subject to orders to move which she believed were unlawful, and she felt that agreeing to those orders would result in the "trampling of her First and Fourth Amendment rights." (ECF No. 66 at 54.) When a person has no desire to leave the scene of an encounter with police, "the degree to which a reasonable person would feel he or she could leave is not an accurate

measure of the coercive effect of the encounter." *Florida v. Bostick*, 501 U.S. 429, 435-36 (1991). "In such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* The "crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 568 (1988)).

Taking the facts in the light most favorable to Ms. Kurland, a reasonable jury could conclude that the officers' conduct before the arrival of Lieutenant Smith would have communicated to a reasonable person that she could not ignore the police presence and go about her business. "[O]f course, officers may generally take actions that a private citizen might do without fear of liability," such as consensually requesting that a person move. *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021). However, Ms. Kurland contends that Officers Abenante and Richards ordered her to move from in front of the CVS under threat of arrest. A jury could find that a reasonable person in Ms. Kurland's shoes would not have felt free to go about her business and ignore that order. And Ms. Kurland did not ignore the order; she yielded; she moved. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("with respect to a show of authority," a seizure occurs when the subject yields). On these facts, a reasonable jury could find that Officers Abenante and Richards independently seized Ms. Kurland by ordering her to move before the later seizure involving

10

Lieutenant Smith. *Id.* at 625 ("[a] seizure is a single act, and not a continuous fact"); *see also Brendlin v. California*, 551 U.S. 249, 255 (2007) (recognizing that a seizure can occur even where the restraint of movement "[is] quite brief"); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994) (recognizing that an order to move can be a seizure and admonishing the district court for its failure to address the plaintiffs' argument "that they were seized because … they were not free to remain"); *Bennett v. City of Eastpointe*, 410 F.3d 810, 833 (6th Cir. 2005) (reasoning that a seizure occurs "when a reasonable person would not feel free to remain somewhere, by virtue of some official action" and holding that an order to move effected a seizure); *Kurland v. City of Providence*, No. 1:14-CV-524-MSM-PAS, 2020 WL 5821091, at *9 (D.R.I. Sept. 30, 2020) ("A seizure does occur when police assert authority in directing a person's movement, and the person acquiesces to that authority.").

A jury could also find that Officers Abenante and Richards' conduct renders them liable for the later seizure of Ms. Kurland involving Lieutenant Smith. That Officers Abenante and Richards did not physically apprehend Ms. Kurland or direct another to do so is not dispositive. "When the defendants act together, the law permits the injured party to treat all concerned in the injury jointly; and all are liable to the plaintiff in a total sum of damages." *Hall v. Ochs*, 817 F.2d 920, 926 (1st Cir. 1987). This general statement about joint liability provides "the correct statement of joint liability under § 1983." *Id.*; *see also Sanchez v. Pereira-Castillo,* 590 F.3d 31, 50 (1st Cir.2009) ("We employ common law tort principles when conducting inquiries into causation under § 1983.").

Although Lieutenant Smith ultimately ordered Ms. Kurland's arrest, Officers Abenante and Richards initiated the encounter with Ms. Kurland. Moreover, Lieutenant Smith's later presence is attributable to the officers, who called the Lieutenant requesting assistance in addressing Ms. Kurland's conduct. Upon arrival, Lieutenant Smith talked to both officers, which contributed to his determination to make an arrest. And ultimately, Abenante, Richards, and Smith collectively charged Ms. Kurland with obstruction of an officer and the obstruction of lawful business pursuits. (ECF No. 59-13 at 59.) They are all listed as arresting officers on the incident report. *Id.* That Officers Abenante and Richards were neither the ultimate decisionmakers nor the actual arresting officers does not mean they cannot be liable for the arrest—the officers were active participants in Ms. Kurland's arrest who may be jointly liable. *See Santiago v. Fenton*, 891 F.2d 373, 387 (1st Cir. 1989).

Because a reasonable jury could find that Officers Abenante and Richards independently seized Ms. Kurland and were joint actors in her ultimate arrest, summary judgment cannot be granted for Officers Abenante and Richards on the theory that they did not participate in the arrest.

### b.  Reasonableness

For Ms. Kurland's unreasonable seizure and false arrest claims to succeed, she must show not only that she was seized, but also that the seizure was unreasonable. *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989); *see also Dyson v. City of Pawtucket*, 670 A.2d 233, 238 (R.I. 1996) (explaining that an action of false arrest is proper "[w]henver a person unlawfully obstructs or deprives another of his freedom to choose

his location, for however brief a period").  Ms. Kurland was ultimately charged with a suite of offenses: obstruction of a police officer, vandalism via obstruction of a business, disorderly conduct ("violent, tumultuous behavior"), and disorderly conduct ("obstruction of a street or sidewalk").  If the officers reasonably suspected that Ms. Kurland was committing any of these offenses, or any other crime, then the alleged seizure of Ms. Kurland prior to her arrest was reasonable.  *Terry*, 392 U.S. at 31.  And if the officers had probable cause to arrest Ms. Kurland on even one of these charges—or for any other crime—then her ultimate arrest was also reasonable.  *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).  However, because it remains genuinely disputed whether there was cause to believe Ms. Kurland committed any crime, the reasonableness of the alleged seizures is a question for the jury.

The officers and Lieutenant Smith argue that undisputed facts establish Ms. Kurland obstructed officers in the commission of their duties in violation of R.I.G.L. § 11-32-1.  That statute makes it a crime to "obstruct any officer … while in the execution of his or her office or duty."  § 11-32-1.  Defendants suggest that § 11-32-1 empowers police to arrest any individual who hinders any officers' "expeditious and efficient" commission of their duties, even where the hindrance presented "involve[s] alleged protected speech."  (ECF No. 56 at 8.)  The defendants base their interpretation of the statute on the principle that "the proper place to challenge the constitutionally of a law or regulation is in the courts, not on the streets."  *Id.* at 9. They argue that Ms. Kurland's sidewalk lecture unlawfully hindered the commission

of their official duties because it distracted them, attracted a crowd, and undermined their authority. *Id.*

While the Court recognizes that in certain extreme circumstances, a "verbal harangue [may be] so staged and of such length and so disconcerting in character" that it does in fact constitute obstruction of an officer, it remains genuinely disputed whether Ms. Kurland's speech was of that nature. *See Johnson v. Palange,* 406 A.2d 360, 366 (R.I. 1979).

The Officers and Lieutenant Smith also argue that undisputed facts establish Ms. Kurland obstructed another's lawful business, CVS, in violation of R.I.G.L. § 11-44-1. That statute makes it a crime to "willfully and maliciously or mischievously … obstruct another in the prosecution of his or her lawful business or pursuits, in any manner." § 11-44-1. The defendants argue that Ms. Kurland's "actions, right, wrong, or indifferent, interfered with the officers' ability to clear the entranceway area," and that, as such, Ms. Kurland unlawfully obstructed the CVS. (ECF No. 56 at 10.) In addition to her dissenting speech, the defendants note that Ms. Kurland's conduct attracted a crowd near the CVS—a crowd which the defense asserts prevented others from entering the store. *Id.*

Again, it remains genuinely disputed whether Ms. Kurland's speech was "so staged and of such length and so disconcerting in character" as to constitute obstruction of the CVS. *See Johnson,* 122 R.I. at 371. And it remains disputed whether Ms. Kurland conducted herself with the requisite mens rea of willful malice necessary for a charge to adhere under § 11-44-1.

14

Finally, Defendants claim that there was cause to seize Ms. Kurland for disorderly conduct under § 11-45-1.  That statute makes it a crime to intentionally, knowingly, or recklessly "engage in … violent or tumultuous behavior," or to "[a]lone or with others, obstruct[] a … sidewalk." § 11-45-1(a)(1); § 11-45-1(a)(4).  Because it remains disputed where Ms. Kurland, and later the group, actually stood, it also remains disputed whether there was reason to believe that Ms. Kurland, alone or with others, actually obstructed the sidewalk under § 11-45-1(a)(4) or under the related City Ordinance 16-13.  Similarly, because Ms. Kurland's precise conduct during the encounter with the officers remains disputed, it remains disputed whether there was cause to believe Ms. Kurland engaged in violent or tumultuous behavior.

Put simply, there are disputes about material facts that will establish whether or not the Officers and Lieutenant Smith had cause to seize or arrest Ms. Kurland.  The defendants' Motions for Summary Judgment of the unreasonable seizure and false arrest claims are **DENIED.**  For the same reasons, the plaintiff's Motion for Summary Judgment is **DENIED**.

### 2. Unconstitutional Impairment of Freedom of Assembly and Speech

Along with her Fourth Amendment claim, Ms. Kurland alleges that her First Amendment freedom of speech was unlawfully restricted by the defendants.  Ms. Kurland asserts that she was ordered to move and subsequently arrested without probable cause while engaging in political speech on matters of public concern.  Specifically, Ms. Kurland claims that she was arrested in part for challenging and

dissenting from illegal police action. The defendant officers counter that the facts alleged by Ms. Kurland "invoke Fourth Amendment protections, not First Amendment," because "Ms. Kurland spoke for as long as she wanted … [and] [n]one of her speech was squelched or suppressed in any manner." (ECF No. 56 at 5.)

Freedom of speech is a fundamental personal right that lies at the foundation of free government. *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 161 (1939). "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston*, 482 U.S. at 462– 63. Accordingly, the Constitution demands restraint from police officers in the face of "provocative and challenging" speech. *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011). Such provocative and challenging speech is generally protected against censorship or punishment, unless it is shown that it is "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello v. City of Chicago,* 337 U.S. 1, 4 (1949).

The Supreme Court instructs courts to employ a three-step inquiry to determine whether a speech restriction violates the First Amendment. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). First, the Court must determine whether the speech is protected by the First Amendment. *Id.* If the speech is protected, the Court must then determine whether the complained-of speech restriction occurred in a "public or non-public" forum. *Id.* Depending on the forum

16

type, the Court must then apply the appropriate level of scrutiny to determine whether the restriction violates the Constitution.  *Id.*

### a.  Ms. Kurland's Protected Speech

Ms. Kurland alleges that her political speech on matters of public concern was restricted.  "'[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection.'"  *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)).  "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'"  *Id.*

Ms. Kurland contends that she was "recit[ing] case law and constitutional law principles" to members of Providence's homeless community when she was engaged and subsequently arrested by the Officers.  (ECF No. 56 at 2.)  Speech does not get more political than that.  *See McCullen v. Coakley*, 573 U.S. 464, 476 (2014).  While the defendants contend that Ms. Kurland's speech was more threatening than instructive, there is a genuine dispute over whether Ms. Kurland's speech was protected.  *Id.*  And her alleged protected speech was restricted: she was ordered to move and subsequently arrested while engaged in its expression.  *See Glick,* 655 F.3d at 84.

### b.  The Public Forum

The sidewalk where Ms. Kurland proselytized was plainly a public forum.  *See United States v. Grace*, 461 U.S. 171, 179 (1983) ("Sidewalks … are clearly within

those areas of public property that may be considered, generally without further inquiry, to be public forum property.").

### c. The Restriction on Ms. Kurland's Speech

The seizure of a person engaged in expression implicates both First and Fourth Amendment protections when the seizure restricts the subject's speech. *See, e.g.*, *Glick*, 655 F.3d at 84 (the unlawful arrest of a bystander recording a police encounter was an unconstitutional speech restraint). When political speech in a public forum is alleged to be restricted, the level of scrutiny which the Court applies depends on whether the restriction was content neutral or content based. *See McCullen*, 573 U.S. at 478. A content-based restriction is unlawful unless it "serves a compelling governmental interest by the least restrictive means." *Id*. Restrictions which are content neutral, on the other hand, are unlawful unless "they are narrowly tailored to serve a significant governmental interest" while "leav[ing] open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

The principal inquiry in determining a restriction's content neutrality is whether the government restricted speech because of disagreement with the message it conveys. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 295 (1984). "The government's purpose [for the restriction] is the controlling consideration." *Rock Against Racism*, 491 U.S. at 791. A restriction of expressive activity is content neutral so long as the government can "justif[y] [the restriction] without reference to the content of the regulated speech." *Id.*

Ms. Kurland asserts that the restriction on her speech was content based.  In support of this allegation, Ms. Kurland points out that: (1) video evidence and sworn testimony show that the sidewalk was not obstructed, (2) Ms. Kurland was the only person arrested for obstruction, and (3) the defendant officers testified that they did not address commands to other individuals at the scene because they believed that Ms. Kurland's specific statements were the problem.  (ECF No. 60 at 33.)  For example, Ms. Kurland highlights Officer Abenante's sworn testimony that he called Lieutenant Smith to the scene in part because Ms. Kurland "was reciting some case law where somebody told a cop he can shoot them in the head."  (ECF No. 59 at 14); *see McKenna,* 415 A.2d at 730.  On these facts, a reasonable jury could find that the restriction on Ms. Kurland's expression was content based.  Because a content-based restriction is presumptively unconstitutional, summary judgment is not appropriate for the defendants.

Even if a jury did not find that the restriction of Ms. Kurland's speech was content based, a reasonable jury could find that the restriction fails to meet the intermediate standard of scrutiny applied to content-neutral restrictions.  A jury could find that there was no obstruction, and thus that the government interest served by the restriction was nonexistent.  The defendants' motion is **DENIED**.

Ms. Kurland's motion is also **DENIED** because a reasonable jury could find that the instructions for Ms. Kurland to move and her subsequent arrest were not motivated by the content of her speech but because she obstructed the CVS or otherwise committed a crime.  *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1733 (2019)

(probable cause for arrest defeats a § 1983 First Amendment retaliatory arrest claim unless the plaintiff can show that "otherwise similarly situated individuals" whose speech differed were not arrested).

### 3. Constitutional and Common Law Malicious Prosecution

Ms. Kurland asserts that Officer Abenante, Officer Richards, and Lieutenant Smith maliciously prosecuted her and sues under constitutional and common law. The elements of a constitutional and common law malicious prosecution claim are similar but not identical. *See Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 99 (1st Cir. 2013). A plaintiff can establish a constitutional malicious prosecution claim under § 1983 if she can show that the defendants "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Id.* at 100–01. A plaintiff can establish a malicious prosecution claim under Rhode Island law if she can show that the defendants "(1) initiated a criminal proceeding against [her]; (2) *with malice*; (3) and without probable cause; which (4) terminated in plaintiff's favor." *Solitro v. Moffatt*, 523 A.2d 858, 861–62 (R.I. 1987) (emphasis added); *Nagy v. McBurney*, 392 A.2d 365, 367 (1978). These approaches are "largely identical with one caveat." *Hernandez-Cuevas*, 723 F.3d at 99. While a plaintiff alleging a constitutional claim need only establish that her seizure was unsupported by probable cause, a plaintiff alleging a common law claim must also show that the defendant officer acted with subjective malice. *Id.* Additionally, a common law plaintiff must establish the elements of

malice and lack of probable cause by "clear proof." *Powers v. Carvalho*, 368 A.2d 1242, 1246 (R.I. 1977).

The malice element is less significant than it first appears in distinguishing the constitutional and common law malicious prosecution torts. Under Rhode Island law, malice may be inferred from proof that prosecution was instituted without probable cause. *See, e.g.*, *Nagy*, 392 A.2d at 367 ("Proof of actual ill will, however, is not a sine qua non, for a hostile motive may also be inferred from a showing of a lack of probable cause."). Thus, if a reasonable jury could find that the officers caused the seizure of Ms. Kurland pursuant to legal process unsupported by probable cause, then a reasonable jury could also infer that the officers acted with subjective malice. *See*, *e.g.*, *Costa v. Rasch*, No. CV 11-336L, 2014 WL 12803016, at *6 (D.R.I. July 29, 2014) ("The third element – maliciousness – may be subsumed by the second; that is, malice may be inferred from proof that the prosecution was instituted without probable cause."). Therefore, the court will consider the constitutional and common law malicious prosecution claims together.

### a. Causation & Initiation

As a threshold argument, the officers and Lieutenant Smith contend that they cannot be liable for malicious prosecution because "none of them prosecuted the plaintiff." (ECF No. 56 at 13.) That argument fails because "prosecut[ing] the plaintiff" is not an element of the tort. *See Hernandez-Cuevas*, 723 F.3d at 99. What matters is whether the officers and Lieutenant Smith "caused" or "initiated" the criminal proceedings against Ms. Kurland. *Id.*

21

To determine whether a police officer "caused" a criminal proceeding under § 1983, a court will apply common law tort principles. *Hernandez-Cuevas*, 723 F.3d at 100. "The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 561 (1st Cir. 1989). "Even where … a prosecutor retains all discretion to seek an indictment, police officers may have caused the seizure and remain liable to a wrongfully indicted defendant." *Hernandez-Cuevas*, 723 F.3d at 100.

To determine whether police officers "initiated" a criminal proceeding under Rhode Island law, a court will ask whether "the state Attorney General's office was free of pressure or influence exerted by the police officers or knowing misstatements made by the officers." *Senra v. Cunningham*, 9 F.3d 168, 174 (1st Cir. 1993). For example, when police officers have lied about the events in question and communicated that false information to prosecutors, the officers have initiated the criminal proceedings. *Id*.

Ms. Kurland alleges that Officer Richards, Officer Abenante, and Lieutenant Smith filed a police report that was "at the very least misleading and more likely intentionally false." (ECF No. 60 at 55.) In support of this allegation, Ms. Kurland points to discrepancies between the police report, the video evidence of the arrest, and the officers' deposition testimony. *Id*. Ms. Kurland also alleges that Officer Abenante made misleading statements to Attorney General Arthur DeFelice over the

phone.  *Id.*  In support of this claim, Ms. Kurland points to contradictions between the officer's deposition testimony and Attorney General DeFelice's notes of the call. *Id.*  Based on this evidence, a reasonable jury could find that the officers lied to or misled prosecutors about their encounter with Ms. Kurland, which is sufficient to meet the causation element of both the constitutional and common law claim.

### b.  The Presence of Probable Cause

The next requirement of both the constitutional and common law tort is that the criminal proceedings be without probable cause.  For the reasons provided in the discussion of the alleged seizure and arrest of Ms. Kurland, a reasonable jury could find that the criminal proceedings against her were initiated without probable cause. There is also sufficient evidence for a reasonable jury to infer malice if they find a lack of probable cause.  *See Nagy*, 392 A.2d at 367.

### c.  The Termination of Proceedings in Ms. Kurland's Favor

The final requirement of a constitutional or common law malicious prosecution claim is that the criminal proceedings terminated in the plaintiff's favor.  A trial of the action on the merits is not required to establish a favorable termination.  "To demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction."  *Thompson v. Clark*, 142 S. Ct. 1332, 1335 (2022).  Similarly, under Rhode Island law, "the dismissal of the proceedings complained of, either voluntarily or by reason of a failure to prosecute, followed by the discharge of accused, is in general sufficient termination thereof to

23

support the action of malicious prosecution." *Moreau v. Picard*, 169 A. 920, 921 (R.I. 1934). The reason for the rule as stated is that: "To require a trial of the action on the merits resulting in an acquittal would be to permit a prosecutor to do all the damage which a malicious prosecution can possibly effect, and then deny the accused the opportunity to vindicate himself by a trial, by having the proceeding quashed or dismissed, and thus escaping all liability for the wrong unlawfully inflicted." *Id*.

The charges against Ms. Kurland were disposed on a not guilty filing on all counts. Because the proceedings against Ms. Kurland were disposed of and Ms. Kurland was discharged without a conviction, the proceedings against Ms. Kurland were favorably terminated for purposes of the constitutional and common law tort.

For these reasons, the defendants' Motions for Summary Judgment of the malicious prosecution claims are **DENIED**. Ms. Kurland's motion is also **DENIED**, as there remains a genuine dispute over whether the officers had probable cause to initiate the criminal proceedings in the first instance.

### B.    Direct Causes of Action Under the Rhode Island Constitution

Ms. Kurland brings three counts as direct causes of action under the Rhode Island Constitution alleging violations of her state constitutional rights: impairment of freedom of assembly and speech in violation of Article 1, § 21 of the Rhode Island Constitution (Count II), violation of the right to freedom from unreasonable search and seizure in violation of Article 1, § 6 of the Rhode Island Constitution (Count IV), and malicious prosecution in violation of Article 1, § § 2, 6 and 7 of the Rhode Island Constitution (Count VI). Looking to and deferring to Rhode Island state law, the

Court finds that Ms. Kurland does not have a private cause of action for the alleged violations under the Rhode Island Constitution.

The Rhode Island Supreme Court has consistently held that state constitutional provisions do not create a private cause of action without legislative action.  *See, e.g.*, *Folan v. State Dep't of Child., Youth, and Families,* 723 A.2d 287, 292 (R.I. 1999) (Article 1, § 2, anti-discrimination clause); *Doe v. Brown Univ.*, 253 A.3d 389, 401 (R.I. 2021) (Article 1, § 2, due process clause); *Felkner v. R. I. Coll.*, 203 A.3d 433, 447 (R.I. 2019) (Article 1, § 21, freedom of speech and right to assemble).  The Rhode Island Legislature has not acted to create a private cause of action to redress violations of Article 1, §§ 2, 6, 7, or 21 of the state constitution.  Ms. Kurland relies on *Jones v. State of Rhode Island*, 724 F. Supp. 25, 34-36 (D.R.I. 1989) to assert that an implied cause of action exists stemming from the provisions of rights themselves, but her reliance on the case is misplaced.

At the time *Jones* was decided in 1989, there was no definitive statement from the Rhode Island Supreme Court on whether the Court recognized private causes of action under the Rhode Island Constitution.  The decision in *Jones* was simply an attempt to predict how the state's highest court would rule on the narrow question presented, whether a cause of action under Article 1, § 2 of the Rhode Island Constitution exists.  "A 'federal court may attempt to predict how [a] state's highest court would rule on [an] issue in a pending federal case,' based upon existing state law or 'better reasoned authorities' from other jurisdictions." *Mullowney v. USAA*

*Cas. Ins. Co., No. CV 22-404 WES*, 2023 WL 4198665, at *2 (D.R.I. June 27, 2023) (quoting *Lieberman-Sack v. HCHP-NE*, 882 F. Supp. 249, 254 (D.R.I. 1995)).

The *Jones* court relied on Supreme Court authority, *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), to conclude that an implied cause of action for an alleged violation of the due process clause of Article 1, § 2 of the Rhode Island Constitution exists. *Jones*, 724 F. Supp. 25 at 35. In *Bivens,* the Supreme Court had recognized the existence of an implied right to sue federal officials in federal court based on violations of the Fourth Amendment of the U.S. Constitution. *Bivens*, 403 U.S. 388 at 396. The *Jones* court invoked a "*Bivens*-like analysis," to conclude that there is an analogous implied right to sue under Article 1, § 2 of the Rhode Island Constitution. 724 F. Supp. 25 at 35. But *Jones* was not the final word.

In the years since *Jones* was decided, the Rhode Island Supreme Court has provided a clear statement on the issue, a statement which governs our decision today. Since *Jones,* the Rhode Island Supreme Court has repeatedly expressed reluctance to "create a new cause of action" by judicial interpretation rather than legislative enactment and has expressly refused to recognize implied causes of action under Article 1. *See, e.g.*, *Doe*, 253 A.3d at 401; *Felkner*, 203 A.3d at 447. These decisions control: Ms. Kurland's claims are not actionable under Article 1, § § 2, 6, 7, or 21 of the Rhode Island Constitution. *See also Bandoni v. State*, 715 A.2d 580, 587 (R.I. 1998) (articulating a general averseness to implied causes of action).

Because Ms. Kurland may not maintain a private cause of action for violations of Article 1, § § 2, 6, 7, or 21 of the Rhode Island Constitution, all Defendants' Motions for Summary Judgment are **GRANTED** as to Counts II, IV, and VI.

### C.    Supervisory Liability

In addition to the officers and Lieutenant Smith, Ms. Kurland sues Providence's then Chief of Police, Hugh T. Clements Jr., and the Commissioner of Public Safety, Steven Paré—the officers' supervisors—for damages stemming from the Kennedy Plaza encounter.  Supervisory liability must be based on the supervisor's own conduct; the doctrine of *respondeat superior* does not apply.  *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009).  In other words, there must be an "affirmative link between the behavior of [the officer] and the action or inaction of his supervisor … such that the supervisor's conduct led inexorably to the constitutional violation."  *Feliciano-Hernandez*, 663 F.3d at 533.  At the least, a supervisory official must have actual or constructive notice of the violation and act deliberately by failing to resolve it.  *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 768 (1st Cir. 2010).

### 1.  Chief Clements

Police Chief Clements testified that at the time of Ms. Kurland's arrest, Providence Police officers were "routinely" telling people to move from public sidewalks in front of businesses.  (ECF No. 59-12 at 65.)  He also testified that he knew that individuals "were complaining about being told to move along in … public spaces" when they were not committing illegal acts, and that he knew this alleged police conduct presented constitutional concerns.  *Id.* at 91–95.  Despite his concerns,

Chief Clements did not take any specific action to determine whether officers were, in fact, ordering people to move only if they had committed a criminal act. *Id.* at 103. Considering Chief Clements' testimony, a reasonable jury could conclude that Chief Clements made a deliberate decision not to act to resolve a known constitutional issue, which led to the alleged constitutional violations. Defendants' Motion for Summary Judgment is **DENIED** as to the surviving claims against Chief Clements. Plaintiffs' motion is also **DENIED**. The same factual disputes that preclude summary judgment of Ms. Kurland's underlying claims preclude summary judgment of Chief Clements' liability.

### 2. Commissioner Paré

Ms. Kurland has failed to identify facts that show that Commissioner Paré's conduct inexorably led to the alleged constitutional violations. The defendants' motion is **GRANTED** as to all claims against Commissioner Paré.

### D. Municipal Liability

Ms. Kurland also sues the City of Providence for the officers' alleged violations. Under 42 U.S.C. § 1983, a municipality is liable for harms caused by its employees when "execution of a government[ ] policy or custom … inflicts the injury." *Monell v. N.Y. City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978). To recover from a municipality, a plaintiff must "demonstrate both the existence of a policy or custom and a causal link between that policy and the constitutional harm." *Santiago v. Fenton*, 891 F.2d 373, 381 (1st Cir. 1989). Policies and customs "include[ ] the decisions of a government's lawmakers, the acts of its policymaking officials, and

practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). These are "action[s] for which the municipality is actually responsible." *Pembaur v. Cincinnati*, 475 U.S. 469, 479–480 (1986).

Ms. Kurland contends that the Providence Police Department has a custom or policy which encourages officers to unlawfully invade the constitutionally protected right of people to peaceably assemble and exercise other First Amendment rights on public sidewalks and in other public forums. There is no evidence that the Providence Police Department promulgated any written or formal policy to this effect. That said, even in the absence of a formal policy, a custom may be attributable to Providence if it can be shown that the alleged practice is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir.1989).

A reasonable jury could find that a custom of ordering people on public sidewalks to move without cause exists in the Providence Police Department that caused a constitutional harm to Ms. Kurland. The deposition testimony of Lieutenant Smith, Officer Abenante, Officer Richards, and Police Chief Clements shows that the complained-of conduct in this case arose from a well-settled police department practice of ordering people to move.

Lieutenant Smith, the District One Commander at the time of Ms. Kurland's arrest, testified that around the time of the arrest, the Providence Police were

routinely receiving complaints from businesses in the downtown area about individuals standing on the sidewalk near an entrance or exit to a business. (ECF No. 59-7 at 27.) According to his testimony, the Providence Police "were requested by the business owners … to ask people to move out of the doorways, right or left of the doorway, to allow businesses to operate." *Id.* In response to these requests, the police department "would … assign a police officer to that street to ask people to move to the right or left to allow people to enter and exit the buildings and garages." *Id.* at 28. Notably, the officers' instructions to move extended beyond people actually blocking an entrance to include people "in the general area of [an] entrance." *Id.* at 40. People in a businesses' general area who were not obstructing a business or doing anything illegal would still be asked to move, "[i]f the business was asking [the police]." *Id.* at 51. In those cases, officers "would have people move just a little further down to accommodate both parties." *Id.* at 75.

Officer Abenante testified that when on assignment in Kennedy Plaza, he had authority to order people "in the general vicinity" of a business to move. (ECF No. 59-5 at 57.) He added that "general vicinity" ranged from "3 feet from the door [to] 20 feet from the door." *Id.* at 59. While he acknowledged that a person could be arrested or asked to move only if they were obstructing a business or otherwise committing a crime, he reasoned that what constitutes obstruction is "dependent on the factors at hand." *Id.* According to Officer Abenante, those factors included "the perception" others might have of the person occupying the sidewalk. *Id.* at 48.

Officer Richards testified that on the date of Ms. Kurland's arrest, he and Officer Abenante had instructed up to ten people to move in the 45-minute period since their arrival in Kennedy Plaza. (ECF No. 59-6 at 57.)

Police Chief Clements does not dispute that he knew about the practice described by the officers, as noted in the discussion of supervisory liability. The same awareness that supports supervisory liability for Police Chief Clements also supports the conclusion that there was an accepted custom of ordering people to move without cause in the Providence Police Department.

The defendants do not dispute that Chief Clements is a policymaking official, and, while he only needed constructive knowledge, he has admitted to possessing actual knowledge of the police department's complained-of custom. He also failed to act to end the practice despite complaints that people were being asked to move without cause. Based on these facts drawn from the testimony of the officers, Lieutenant Smith, and Chief Clements, a reasonable jury could find that policymaking officials failed to end a known custom of moving people on public sidewalks without cause, which caused the alleged harm to Ms. Kurland. Therefore, summary judgment of the claims against Providence is not appropriate. Defendants' motion is **DENIED**.

Summary judgment is not appropriate for Ms. Kurland either. The same factual disputes that preclude summary judgment of Ms. Kurland's underlying claims preclude summary judgment of municipal liability. Plaintiff's motion is **DENIED**.

### E.    Sovereign Immunity

Ms. Kurland sues the defendants under § 1983 and state law in both their official and their individual capacities for violating state law and her civil rights. § 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a municipality for alleged deprivations of civil rights. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989). Section 1983 authorizes suits against 'persons' who invade constitutional rights, and the Supreme Court has concluded that a municipality is not a 'person' for purposes of § 1983 liability. *Id.* Because a suit against a municipal official in his or her official capacity is a suit against the municipality itself, municipal officials may not be sued for damages in their official capacities under § 1983 either. *Id.* The defendants' Motions for Summary Judgment of all § 1983 claims brought against Providence officials in their official capacities are **GRANTED**.

In general, the Eleventh Amendment bars suits against a municipality unless the municipality has waived its immunity. *Id.* Rhode Island has enacted a broad waiver of sovereign immunity statute; R.I.G.L. § 9-31-1 "subjects the state *and its political subdivisions* to liability in all actions of tort 'in the same manner as a private individual or corporation.'" *Laird v. Chrysler Corp.*, 460 A.2d 425, 428 (R.I. 1983) (emphasis added); *see also Graff v. Motta*, 695 A.2d 486, 490 (R.I. 1997) (the city of Warwick was not immune from false arrest and malicious prosecution claims).

Defendants' Motions for Summary Judgment of the official capacity, common law malicious prosecution and false arrest claims are **DENIED**.

### F.    Qualified Immunity

The defendant officers assert that they are entitled to qualified immunity from Ms. Kurland's claims.  The doctrine of qualified immunity shields both federal and state officials from liability for damages in a civil rights action "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  A right is clearly established if its contours are "sufficiently clear that every 'reasonable official would have understood that what he is doing violates that right.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The defendants contend that police conduct during the Kennedy Plaza encounter did not violate any clearly established right.

In resolving questions of qualified immunity at summary judgment, courts engage in a two-element inquiry.  *See Tolan v. Cotton*, 572 U.S. 650, 655 (2014).  First, the court asks whether the facts "taken in the light most favorable to the party asserting the injury … show the officer's conduct violated a federal right." *Id.*  If the facts make out a violation of a federal right, the court asks "whether the right in question was clearly established at the time of the violation." *Id.*

The discussion above establishes that Ms. Kurland has sufficiently shown a constitutional violation when all facts are construed in her favor.  As such, the court

33

moves to the second element, whether the rights violated were clearly established. The court must ask whether, under the circumstances, Ms. Kurland's rights to freedom of speech and to not be seized and prosecuted without cause were sufficiently clear. *See City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) ("Under our cases, the clearly established right must be defined with specificity."). Because certain facts about the circumstances at hand remain disputed, the court will assess whether Ms. Kurland's allegations as modified by the summary judgment record make out a claim sufficient to overcome qualified immunity before denying a motion for summary judgment. *See Est. of Rahim by Rahim v. Doe*, 51 F.4th 402, 411 (1st Cir. 2022).

Taking the record in the light most favorable to Ms. Kurland, a reasonable jury could conclude that Ms. Kurland was ordered to move and subsequently arrested without legal basis while engaging in political speech on the sidewalk at a distance from any business entrance. It is well-established that the Fourth Amendment requires cause to seize and prosecute an individual. *See, e.g.*, *Hayes v. Florida*, 470 U.S. 811, 816 (1985) (on arrests); *Kernats*, 35 F.3d at 1184 (on orders to move: granting qualified immunity for the instant case but expressing an unwillingness to do so in future cases); *Wheeler v. Nesbitt*, 65 U.S. 544, 546 (1860) (on malicious prosecution). And it is well-established that one cannot be arrested simply for protected speech. *See, e.g.*, *Nieves*, 139 S. Ct. 1715 at 1722. Thus, the defendants are not entitled to qualified immunity on the facts taken in light most favorable to

Ms. Kurland.  The defendants' Motion for Summary Judgment of Qualified Immunity is reserved to be decided after trial based on the jury's resolution of the disputed facts.

## IV.    CONCLUSION

For the foregoing reasons, the defendants' Motions for Summary Judgment are **GRANTED** as to the claims under the R.I. Constitution (Counts II, IV, and VI) and the official capacity § 1983 claims; **DENIED** as to the individual capacity § 1983 claims (Counts I, III, and V) and the common law malicious prosecution and false arrest claims (Counts VII and VII); and **RESERVED** as to qualified immunity. Plaintiff's Motion for Summary Judgment is **DENIED** on all counts.

IT IS SO ORDERED.

Mary S. McElroy
United States District Judge
January 8, 2024